**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ST. JOHN'S CONSTRUCTION CO.          *

      Plaintiff          *

v.          *          CIVIL CASE NO.: WDQ-02-CV-2338

ZURICH AMERICAN INSURANCE          *
COMPANY, et al

                                       *

      Defendants          *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY**
**JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**

      Plaintiff St. John's Construction Co. (hereinafter referred to as "St. John's" or

"Insured") respectfully submits this memorandum of law in opposition to Defendants' Motion

for Summary Judgment and in support of its Cross Motion for Summary Judgment in the

captioned case.

**INTRODUCTION**

      Defendants cannot escape the consequences of three critical facts, none of which

are disputed, which are determinative of coverage in this case: 1) the Insured timely submitted its

Monthly Reporting Form for the month of the fire, October 2000; 2) the October 2000 Monthly

Reporting Form listed the property damaged in the fire; and, 3) the damaged property previously

had been reported to Zurich (it was not a "new start").  Upon those facts alone, Plaintiff is

entitled to summary judgment, even notwithstanding the HBIS-4 endorsement so hotly contested by the parties.[1]

Defendants' Motion for Summary Judgment, as to the contractual counts, does not fare as well.  If the HBIS-4 form is not a part of the Policy, then Defendants' Motion must be denied for loss of its essential premise.  The relationship of the HBIS-4 form to the Policy, if any, is a material fact which is central to the dispute between the parties in this case.[2]  Accordingly, summary judgment is not proper.  If the HBIS-4 form is included within the Policy (which Plaintiff submits cannot be decided as a matter of law), Defendants' Motion for Summary Judgment, predicated on the earlier edition of the HBIS-4 form, still must fail.

Briefly summarized, the Insured has Builders Risk insurance.  A copy of the Policy was never provided to the Insured or its agent, with the exception of the declarations page and monthly reporting forms.  A fire loss occurred in October 2000 at an inventoried  location, which had been reported in each monthly reporting form filed since the inception of the Policy.  Under any interpretation of the Policy, which is ambiguous at best, the reporting and payments timely made for the month of the fire preclude denial of coverage on non-payment or non-reporting grounds.

Without a doubt, Plaintiff erred in its submission of forms and payments.  Equally without a doubt however, Defendants are seeking to use that error to achieve a windfall under the

---

[1]  An insured's payment and reporting history was not a factor in coverage analysis, on the face of the builders' risk policies until, at the earliest, policies which commence after the HBIS-4 form was revised in 2000.

[2]  Defendants' also seek summary judgment as to Plaintiff's claims for bad faith and negligent misrepresentation, which also are addressed in Plaintiff's Opposition herein.

Policy.  Premiums can continue to be and are in fact being collected, yet Defendants, based upon

their post-loss coverage analysis, can lie in wait for a denial of any claim Plaintiff may ever

submit.  That cannot have been the intent and is not supported by any reasonable interpretation of

the Policy language.

## **FACTUAL BACKGROUND**

Even a cursory review of the factual background, the loss and the Policy reveals

that the insurance policy purchased by Plaintiff covers the October 2000 fire loss sustained at the

Poe Avenue property.

### The Parties

St. John's is in the business of construction and property management and, as

such, requires insurance to protect against loss on its construction projects and management of

properties.  Exhibit 1: Deposition of Frank Scarfield, at page 6.[3]  At any given point in time, St.

John's, and its associated entities, have numerous insurance policies, many of which are

administered by St. John's general clerical assistant, Beverly Skalski.  Id. at 7-9.  Frank Scarfield,

Sr. is the owner of St. John's and other businesses, for which Ms. Skalski performs

administrative work, including the payment of insurance premiums.  Id. at 7-9, 11.  Ms. Skalski

also maintained the insurance records for St. John's.  Id. at 16.  All of St. John's insurance needs

were placed through the same insurance agency, Mid-Atlantic Insurance Services, which was

owned and operated by Chris Seebach.  Id. at 6, 19.

---

[3]  After the first identifying reference to a deposition, all future references will be in the
format "Exhibit [#]: [Deponent's last name] at [page #]" or "Id. at [page #]."  All referenced
exhibits are attachments to this Memorandum, but are filed in paper format.

In October, 1999, Mr. Scarfield, through his business, St. John's, began a new project for which builder's risk insurance was required. This project, pursuant to a contract with the City of Baltimore, involved the construction of townhouses, including the location known as 4800 - 4816 Poe Avenue, in Baltimore, Maryland (the Poe Property). Exhibit 2: Scarfield Affidavit, ¶ 3.

Defendants Zurich American Insurance Company (hereinafter referred to as "Zurich") and Assurance Company of America (hereinafter referred to as "Assurance Co." or "Insurer") are engaged in the business of providing insurance, including commercial property insurance and builders risk coverage tailored for construction companies. Defendant Zurich Insurance Services, Inc. (hereinafter referred to as "Zurich Services") is a managing general agent for Defendant Assurance Co., providing sales, marketing and support services for Defendant, including with respect to the Policy at issue in this case. Exhibit 3: Deposition of Virginia Deighan, at pages 14, 17-19.

The Policy

Zurich, through its subsidiary Assurance Company of America, issued a Commercial Inland Marine policy, with Builders Risk coverage, numbered BR 96267092, to St. John's, effective October 6, 1999 (hereinafter referred to the "Policy"). Exhibit 4. Mid-Atlantic Insurance Services placed the insurance for St. John's. The Policy was a continuous policy with a reporting form for the determination of the policy premium. According to the declarations page, the following forms were marked with an "X," as applicable to all coverage parts of the policy: 40471 (Builders Risk Coverage Form); 47681 (Commercial Inland Marine Coverage Part); CM0001 (Commercial Inland Marine Conditions); and IL0017 (Common Policy

4

Conditions).  The form designated HBIS-4 was <u>not</u> marked with an "X" to identify that form as

applicable to the policy purchased by the Insured.  <u>Id</u>.  This declaration page, without the

inclusion of HBIS-4 as an applicable coverage part, was the only part of the Policy which was

provided to the Insured prior to the fire loss.  Exhibit 5: Deposition of Beverly Skalski at 77-78.

Ordinarily, the absence of an "x" in the form list means that the form is not included within the

Policy.  Exhibit 6: Deposition of Chris Seebach at 28-29.  Ms. Skalski read the declarations page

prior to the fire.   Exhibit 5: Skalski Dep. at 42.

   The monthly reporting condition applicable to this Insured is found in the Builders

Risk Plan Monthly Rate Reporting Form ("Reporting Form") submitted on a monthly basis.

Copies of the reporting forms submitted by the Insured for March 2000 through October 2000,

with premium payment checks and transmittal envelopes, are attached hereto collectively as

Exhibit 7.  The Reporting Form generally provided:

> "Any structures **started but not reported** within the time stated in
> the policy are not covered.  All structures in inventory for the
> month ending _____ must be reported and payment received
> in the lockbox by _____ in order for coverage to be in effect."

The reporting form, by its terms, is made a part of the Policy:

> "When completed and received with payment, this form becomes a part of your
> policy."

<u>Id</u>.  The Reporting Form for the month of the fire, October, 2000, specifically provided:

> "Any structures **started but not reported** within the time stated in
> the policy are not covered.  All structures in inventory for the
> month ending <u>October, 2000</u> must be reported and payment
> received in the lockbox by <u>November 30, 2000</u> in order for
> coverage to be in effect."

Id.: October 2000 Reporting Form.  The Poe Property was not a new start in the month of the fire, October 2000.  Id.: March 2000 Reporting Form.  The premium for October 2000 for the Poe Property was paid, and reported prior to November 30, 2000.  Id.: October 2000 Reporting Form.  Mr. Seebach understood that coverage would be in effect so long as the report and payment for the month of the loss was received by the 30th of the following month.  Exhibit 6: Seebach Dep. at 104-04.

The requirements for the reporting of new starts, referenced in the Reporting Form, are set forth in the body of the Policy, under Section E, "Additional Conditions," provided:

> E(3)(e)[Coverage ends] at the end of 12 months from the month when you first reported the location to us unless you report the location again and pay an additional premium . . .
>
> 4(a)    Each month you must report to us the *total estimated completed values* of all Covered Property for each location **started** during the previous month . . .
>
> 4(g)    If at the end of 12 months from the time you first reported a start to us, you still have that location in your inventory, you **may** report that location to us a second time . . .

Exhibit 4.

Although the Insured contends that the HBIS-4 Form is not a part of the Policy, its provisions, the provisions of the endorsement are addressed here in light of Defendants' Motion. The form substitutes new language for certain of the Additional Conditions in Section E of the Policy, including "Reporting Provisions."  The 10-96 edition of the HBIS-4 form provides, as to coverage for losses:

> b.    "If, at the time of **loss**, you have not reported a Covered Property as required in this provision, we do not cover that Covered Property for that **loss.** (Emphasis supplied).

6

Exhibit 8.  For existing inventory, the provision required only reporting, by the last day of the

month, all inventory for the previous month.  Defendants later, after inception of the Insured's

Policy, revised the HBIS-4 endorsement.[4]  In the 01-2000 edition of the HBIS-4 form, the loss

proviso stated:

> b.    "If, at the time of a **loss** on a location, <u>we have not received all reports and
> premium payments that were due for that location</u>, then we will not
> provide any payment for that **loss**.  In addition, you must submit a report
> and premium payment for that location for the month in which the **loss**
> occurred, and we must receive that report and premium payment on time
> (i.e. by the last day of the month following the **loss**) or we will not cover
> that **loss**."  (Emphasis Supplied).

Exhibit 9.

<u>The Insured's Reporting and Payment History:</u>

There are three undisputed facts that are critical to the coverage determination in

this case.  The Insured timely submitted its Monthly Reporting Form for October 2000.  Exhibit

7: October 2000 Reporting Form.  The October 2000 Monthly Reporting Form listed the property

damaged in the fire and for which this Claim is made.  <u>Id</u>.  The property previously had been

reported to Zurich (it was not a new start).  <u>Id</u>.: March 2000 Reporting Form.[5]

Due to a mix-up at the Insured's business, the Reporting Forms for the months of

April, May, June and July 2000 were prepared, but were not timely submitted for payment and

---

[4]  Although the liberalization clause of the Policy does not permit restriction of coverage
during the term of the Policy, the newer edition of the HBIS-4 form is illustrative of the position
taken by Defendants in this case, which was <u>not</u> supported by the language of the earlier version.

[5]  In fact, the Poe Property was first reported in October 1999, at the inception of the
Policy.  Exhibit 10.  Thereafter, the Poe property continued to be reported as a location which
remained in St. John's inventory.  Exhibit 11.

transmittal to Zurich.  Exhibit 7; Exhibit 5: Skalski Dep. at 75-76.  At the time of the fire, Ms.

Skalski believed that all of the premiums had been made and reports filed.  Id. at 75.  At the time

of the fire loss, Mr. Scarfield was not aware that the Policy was set up for monthly payments and

reporting and was also unaware that any monthly reports or premium payments were missing.  Id.

at 76.  When the Insured became aware that those months had not been reported or paid, the back

premium was immediately paid, and accepted by Zurich.  Id.  Ms. Skalski relied upon Mid-

Atlantic and Defendants never informed her about the consequences to late reporting and

payment.  Exhibit 5: Skalski Dep. at 60-61.

Mid-Atlantic, having written hundreds of insurance policies each year, had never

seen an insurer deny coverage of non-payment of premium without first providing notice if its

intention.  Exhibit 6: Seebach at 12-13.  Nor had he heard of such an occurrence from any other

agent.  Id. at 14.  Mr. Seebach understood that such notice was required by law.  Id. at 14-15.

Defendants did not advise Mr. Seebach that coverage could end for non-payment of premium

without any advance notice.  Id. at 26.  If he had been so advised, he probably would not have

recommended that type of coverage to St. John's.  Id. at 29-30. Had notice been provided

concerning non-payment, Mr. Seebach's experience with St. John's suggests that the matter

would have been resolved.  See Id. at 37-38.

The Extrinsic Evidence:

There is ample additional evidence that supports the Insured's interpretation of the

Policy, to provide coverage for its Claim.   The Insurer recognized that by its revision of its

builders' risk insurance product just prior to the fire in this case.  Exhibit 9.  Moreover, prior to

the claim at issue in this case, on April 19, 2000, Insurer, through its agent Zurich Services, sent

a notice to Mid-Atlantic Agency advising that the January 2000 report and premium payment

was late, stating only that "[t]his could present a possible gap in coverage."  Exhibit 12.  Upon

receiving this notice, the problem was immediately addressed by the Insured.  Exhibit 13.

Similarly, on February 21, 2001, the Insurer, through Zurich Services, notified the Insured's

agent that the December 2000 report was late.  Exhibit 14.  The Insured was notified by Mid-

Atlantic on February 26, 2001, and promptly called Zurich Services to track down the check and

report, which had been sent according to the Insured's records.  Id.  Again, by letter dated May 2,

2001, in response to receipt of the Insured's premium check as returned for insufficient funds,

Zurich stated, "If we do not receive your payment within 15 days, your policy #96267092 **could**

be in jeopardy for the **starts** listed."  Exhibit 15.  The Insured's response, of course, was to

promptly correct the situation by sending a cashier's check on May 8, 2001, by federal express.[6]

Exhibit 16.  No notice was sent by Insurer or Zurich Services for the months in which the

premium or reports were not received, including the months of April through August 2000.

Exhibit 6: Seebach Dep. at 71-72.

        Mr. Scarfield, through his agent, Mr. Seebach, and his personal experience with

insurance policies, understood that insurance coverage would not be canceled or otherwise

terminate for nonpayment of premiums, absent advance notice from the insurer.  Exhibit 2:

Scarfield Affidavit, ¶ 2; Exhibit 6: Seebach Dep. at 12-15.  Historically, on occasion, Mr.

Scarfield had received notices of impending cancellation from insurers on various policies for

---

[6] Similar notice was provided to Mid-Atlantic, concerning St. John's Policy, by letters dated January 2, 2002, March 21, 2002, April 22, 2202, and June 21, 2202, each of which also referenced a "possible gap in coverage."  These letters are attached hereto collectively as Exhibit 18.

which insurance premiums had not been timely received.  On each occasion, Mr. Scarfield made

certain that the premium payment problem was resolved so that coverage would continue.

Exhibit 2: Scarfield Affidavit, ¶ 3.  He understood the importance of insurance coverage to the

viability of his businesses, including St. John's.  Id.  He relied on his insurer to provide notice of

any nonpayment of premium which would affect his insurance coverage, and had no reason to

believe that the builders' risk policy in this case was any different in that respect.  Id. at ¶ 4.

Other publications by Defendants did nothing to dispel the understanding of the

Insured and Mid-Atlantic.  For example, the Builders Risk Reporting Form Guidelines  provide,

under Reporting On Time, "If there are no starts to report, returning this form [Reporting Form]

is not necessary."  Exhibit 17.  That same publication provides, as to Monthly Rate, "The

coverage limit is two years."  Id.

Since the Claim, the Insurer has continued to accept premium payments and

conduct its insurance business as if the Insured was and continues to be covered under the Policy.

Exhibits 7 and 18.  The Insurer also communicated a message contrary to its position in this case,

by stating in a flyer dated June 30, 2000, "Proper reporting helps ensure adequate coverage . . . ."

Exhibit 19.  The flyer did **not** contain words to the following effect**:** "You will lose your

coverage if you do not properly report and pay your premiums and we will not notify you that

your coverage is gone."  A message similarly contrary to Defendants' position in its Motion was

conveyed to agents in Defendants' "Agent Manual," for the Builders Risk insurance product.

Exhibit 20.  The publication appears to treat monthly reporting forms as monthly policies, and

does not provide for the "end" of coverage due to any monthly reporting deficiency.  Id.  Yet

another message contrary to Defendants' position in this case was contained within the "Job Site

News" publication sent by Defendants.  Exhibit 21.  The publication states:

**Proper reporting**
We want our builders risk policies to work for you.  For this to happen, reporting
your starts properly is important.  It is the first and most vital step in ensuring
complete coverage. . . .

*             *             *

"If there are no starts to report it is not necessary to return the form."

*             *             *

"Be careful.  Late payments can cause problems with coverage.  It can leave you
without coverage for that reporting period, making you responsible for any losses
in that time."

Exhibit 21.

<u>The Claim</u>

A fire occurred on October 22, 2000, at the Poe Property, causing damage to the

Poe Property.  Exhibit 21.  The fire and associated loss were reported to Zurich and Assurance

Co., through Mid-Atlantic Insurance Services, the designated agent for the reporting of claims by

St. John's.  <u>Id</u>.  Defendants assigned claim number 5660076549 to the fire loss (hereinafter

referred to as the "Claim").  By letter dated November 30, 2000, Zurich and Assurance Co.

advised St. John's that an investigation of the fire loss and damage would be conducted under a

"complete Reservation of Rights," stating as its reason that "the insured failed to make timely

premium payments and during some months, no payments."  Exhibit 23.  Six months later,

Zurich and Assurance Co. denied the St. John's Claim, advising, "[W]e will be unable to assist

you with this loss and claim," and citing the same reasons, as well as an alleged failure to make timely and/or proper reports for locations, including the Poe Property.  Exhibit 24.

## **ARGUMENT**

## III.    **THE STANDARD APPLICABLE TO A MOTION FOR SUMMARY JUDGMENT**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to summary judgment as a matter of law.  In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. Anderson, 477 U.S. at 250; see also Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir.1987); Morrison v. Nissan Motor Co., 601 F.2d 139, 141 (4th Cir.1979); Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir.1950).  The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); Pulliam Inv. Co., 810 F.2d at 128, citing Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979).

A fact issue is material if it must be decided to resolve the plaintiff's substantive claim.  Anderson, 477 U.S. at 248, 106 S.Ct. 2505.  The "materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id.  A dispute about a material fact is genuine "if the

12

evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." Id. at 248, 106 S.Ct. 2505.  Thus, "the judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded [factfinder] could return a verdict for the [nonmoving party] on the evidence  presented."  Id. at 252, 106 S.Ct. 2505.  In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II.     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT MUST BE DENIED.

### A.     Whether the Insured's Policy Included the HBIS-4 Form Is a Disputed Material Fact Which Compels Denial of Defendants' Motion for Summary Judgment on the Contract Claims.

Defendants' Motion for Summary Judgment is predicated on the inclusion of the HBIS-4 form as part of the Policy.  That material fact clearly is in dispute.  The only part of the Policy received by the Insured in this case was the declarations page.  Exhibit 5: Skalski Dep. at 77-78.  As Defendants concede, that declarations page did <u>not</u> identify HBIS-4 on the list of forms included within the Policy.  Exhibit 4; Defendants' Brief at 8.  Plaintiff contends that it did not receive the HBIS-4 form prior to the loss at issue in this case.  Accordingly, there is a material dispute about the applicability of the coverage set forth in the form identified as HBIS-4, as well as its transmittal to the Insured.  Summary judgment simply cannot be granted in Defendants' favor under these circumstances.

Defendants' reliance on <u>Tapatio Springs Builders, Inc. v. Maryland Casualty Insurance Company</u>, 82 F. Supp. 2d 633 (W.D. Texas 1999) is misplaced.  The factual distinctions between the case at bar and <u>Tapatio</u> are striking: 1) the <u>Tapatio</u> property was a "new start," which had never been reported prior to the loss, unlike the Poe Property which was existing inventory for St. John; 2) the <u>Tapatio</u> policy declarations page contained an "x" in the form list which identified the monthly rate endorsement as a form included within the policy, yet the insured unsuccessfully argued (like Defendants here) that an unchecked endorsement should apply instead; 3) the insurer in <u>Tapatio</u> returned the premiums attributable to the "new start" property involved in the loss, unlike Defendants in this case; 4) the insured in <u>Tapatio</u> contended

14

that the policy was a non-reporting one-shot policy, whereas Plaintiff herein contests the consequence of the late filing of monthly reports prior to the loss, not the requirement itself,[7] Simply put, a careful review of the Court's analysis in <u>Tapatio</u> strongly suggests that, applying the reasoning of the Court to the facts in this case would compel denial of Defendants' Motion for Summary Judgment, and, indeed, weigh in favor of judgment for Plaintiff.[8]

**B. Disputed Material Facts Preclude Summary Judgment on Plaintiff's Negligent Misrepresentation Claim.**

The prima facie elements of the tort of negligent misrepresentation in Maryland were reiterated in <u>Gross v. Sussex</u>, 332 Md. 247, 630 A.2d 1156 (1993):

> "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
> (2) the defendant intends that his statement will be acted upon by the plaintiff;
> (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if    erroneous, will cause loss or injury;
> (4) the plaintiff, justifiably, takes action in reliance on the statement;  and
> (5) the plaintiff suffers damage proximately caused by the defendant's negligence."

---

[7] Unlike the <u>Tapatio</u> case, the declarations page does contain a box which is checked to designate that a monthly rate applies, which, when combined with the Policy Conditions and the Reporting Form clearly satisfies all of the elements of an insurance contract.  The Reporting Form alone designates when monthly reports and premiums are due, as well as the applicable rate.  Exhibit 7.  Indeed, the HBIS form does nothing more than amend certain Policy conditions. Exhibits 8 and 9.

[8] At a minimum, Defendants' Motion should be denied on the ground that the Policy is ambiguous.  If HBIS-4 applies, then the provisions conflicts with the terms of the Policy set forth in the Reporting Form.  In order to be successful on a motion for summary judgment, there must be no ambiguity in the insurance policy on its face.  <u>Fenwick Motor Company v. Fenwick</u>, 258 Md. 134, 138, 265 A.2d 256 (1970); <u>Nationwide Mutual Fire Insurance Company v. Tufts, et. al.</u>, 118 Md. 180, 187-88, 702 A.2d 422 (1997).

<u>Id</u>. at 259, 630 A.2d at 1162. <u>See also</u> <u>Village of Cross Keys v. United States Gypsum Co.</u>, 315

Md. 741, 755-56, 556 A.2d 1126, 1133 (1989);   <u>Weisman v. Connors</u>, 312 Md. 428, 444, 540

A.2d 783 (1988);  <u>Martens Chevrolet v. Seney</u>, 292 Md. 328, 337, 439 A.2d 534, 539 (1982).

  Defendants challenge only the reliance element in their Motion for Summary

Judgment.  Plaintiff has amply demonstrated evidence that it relied on Defendants'

representations.  For example, prior to the claim at issue in this case, on April 19, 2000, Insurer,

through its agent Zurich Services, sent a notice to Mid-Atlantic Agency advising that the January

2000 report and premium payment was late, stating only that "[t]his could present a possible gap

in coverage."  Exhibit 12.  Upon receiving this notice, the problem was immediately addressed

by the Insured.  Exhibit 13.  No notice was sent by Insurer or Zurich Services for the months in

which the premium or reports were not received, including the months of April through August

2000.  Exhibit 6: Seebach Dep. at 71-72.  By its omission, Defendants misrepresented that the

status of Plaintiff's account and its coverage.  Mr. Scarfield, through his agent, Mr. Seebach, and

his personal experience with insurance policies, understood that insurance coverage would not be

canceled or otherwise terminate for nonpayment of premiums, absent advance notice from the

insurer.  Exhibit 2: Scarfield Affidavit, ¶ 2; Exhibit 6: Seebach Dep. at 12-15.  By not providing

such notice as was required by law, <u>see</u> <u>infra</u>, Defendants represented, by omission, that

Plaintiff's Policy had not been canceled for nonpayment of premium.  All of the communications

from Defendants, <u>see</u> pages 9-11 <u>supra</u>, misrepresented the consequences of ate reporting and

payment under the Policy, based upon Defendants' position in this action.

  While Defendants undoubtedly dispute these contentions, that dispute compels

denial of Defendants' Motion on Plaintiff's negligent misrepresentation claim.

**C.  This Court Should Reconsider Applicability of the Tort of Bad Faith in the First Party Context**

Plaintiff concedes that the law in Maryland has not been supportive of the tort of bad faith in the first party context.  It cannot be disputed that, under Maryland law, an insurer owes to its insured a duty of good faith and fair dealing in claims handling, in the context of third-party claims.  What is disputed here, is the duty owed by that same insurer to its insured, in a first-party property damage claim.  Plaintiffs respectfully submit that the justification for recognizing the tort duty inherent in third-party claims under an insurance policy, is equally persuasive and meritorious in the first-party context.

The tort duty arises out of the conflict between the best interests of the insurer (resolution of the claim to minimize coverage and recovery), and the best interests of the insured (resolution of the claim to maximize coverage and recover for losses sustained).  Whether third-party or first-party claims are at issue, the unjustifiable actions of the insurer, in its own best interest and contrary to that of the insured, can expose the insured to damages beyond those which it would have suffered, but for the insurer's unjustifiable actions.  Those damages may take the form of a judgment against the insured outside the policy coverage limits (third-party) or equally devastating financial detriment from lost revenues or additional expenses not covered by the insurance policy (first-party).

This Court, in Caruso v. Republic Insurance Company, 558 F.Supp. 430 (D. Md. 1983), was presented with the novel issue of whether, under Maryland law, a first-party bad faith claim was viable as a separate tort action.  Id. at 432.  In reaching its decision, the Court in Caruso was troubled by the impact of then-existing punitive damages law upon any decision

17

which would create a tort duty in first-party cases.  Under present law, a lesser standard for the

recovery of punitive damages in tort, as compared with contract, no longer exists.  See Owens-

Illinois v. Zenobia, 325 Md. 420, 601 A.2d 633 (1992)

       The precedent established by the state courts, as well as the cases from this

judicial district relying thereon, firmly represents the minority view among Maryland's sister

states.  Currently, approximately thirty out of fifty states and the District of Columbia appear to

recognize a private cause of action for the insurer's failure to act in "good faith" in first-party

insurance cases, either in tort,[9] contract,[10] under the Unfair Claims Protection Act,[11] the

---

[9]       The following states appear to recognize a cause of action in tort: Alabama, Chavers v. Nat'l Sec. Fire & Cas. Co., 405 So.2d 1 (Ala. 1981); Arizona, Aetna Cas. & Sur. Co. v. Broadway Arms Corp., 664 S.W.2d 463 (1984); California, Gruenberg v. Aetna Ins. Co., 510 P.2d 1032 (Cal. 1973); Colorado, Hiatt v. Schreiber, 599 F.Supp. 1142 (D.Col. 1984); Connecticut, Gradd Shett Metal Prod. Co. v. Protection Mut. Ins. Co., 375 A.2d 428 (Conn.Sup.Ct. 1977); District of Columbia, Washington v. Group Hospitalization, Inc., 585 F.Supp. 517 (D.C. 1984); Delaware, Correa v. Pennsylvania Mfrs. Ass'n Ins. Co., 618 F.Supp. 915 (D. Del. 1985); Idaho, White v. Unigard Mut. Ins. Co., 730 P.2d 1014 (Idaho 1986); Mississippi, Weims v. American Sec. Ins. Co., 486 So.2d 1222 (Miss. 1986); Montana, Bostwick v. Foremost Ins. Co., 539 F.Supp. 517 (D. Mont. 1982); Nevada, U.S. Fidelity & Guar. v. Peterson, 540 P.2d 1070 (Nev. 1975); New Mexico, Chavez v. Chenoweth, 553 P.2d 703 (N.M.Ct.App. 1976); North Carolina, Dailey v. Integon Gen. Ins. Co., 291 S.E.2d 333 (N.C.Ct.App. 1982); North Dakota, Corwin Chrysler-Plymouth, Inc. v. Westchester Fire Ins. Co., 279 N.W.2d 638 (N.D. 1979); Ohio, Kirk v. Safeco Ins. Co., 273 N.E.2d 919 (C.P.Ohio 1970); Oklahoma, Christian v. American Home Assurance Co., 577 P.2d 899 (Okla. 1977); South Carolina, Trimper v. Nationwide Ins. Co., 540 F.Supp. 1188 (D.S.C. 1982); South Dakota, Stoner v. State Farm Mut. Auto Ins. Co., 780 F.2d 1414 (8th Cir. 1982) Texas, Vail v. Texas Farm Bureau Mut. Ins. Co., 754 S.W.2d 129 (Tex. 1988); Vermont, Brunet v. American Ins. Co., 660 F.Supp. 843 (D.Vt. 1987); Washington, Escalante v. Sentry Ins., 743 P.2d 832 (Wash. 1987); West Virginia, Hayseeds, Inc. v. State Farm Fire & Cas. Co., 352 S.E.2d 73 (W.Va. 1986); Wisconsin, A.W. Huss Co. v. Continental Cas. Co., 735 F.2d 246 (7th Cir. 1984).

[10]      Only Indiana appears to recognize a private cause of action in contract: Liberty Mut. Ins. Co. v. Parkham, 487 N.E.2d 168 (Ind.Ct.App. 1985).

[11]      Unfair claims practice statute:  Connecticut, Conn.Gen.Stat. § .38-61-(6) (1979), Griswold v. Union Labor Life Ins. Co., 442 A.2d 920 (Conn. 1982); Florida,

Deceptive Trade Practices Act,[12] the Consumer Protection Statute,[13] or other statutory provisions.[14] Four additional states recognize that the insured may recover damages beyond the policy limits for breach of the insurance contract.[15]

It is significant that while Maryland's Unfair Claim Settlement Practices statute, codified as §230A of the Insurance Code, Article 48A, Annotated Code of Maryland, does not provide for a private cause of action, the Maryland legislature included the following language:

> Nothing contained in this section is intended to provide or deprive any private right or cause of action to, or on behalf of any claimant or other person . . . Id. at §230A(f)(2).

---

Fla.Stat.Ann. §§ 624.155(1)-626.954(1) (Supp. 1990), Fortson v. St. Paul Fire & Marine Ins. Co., 751 F.2d 1157 (11th Cir. 1985); Massachusetts, Mass. Gen. L. ch 176D § 3(9) (1987), Whitney v. Continental Ins. Co., 595 F.Supp. 939 (D.Mass. 1984); Montana, Mont. Code Ann. §§ 33-18-201 (1988), Klaudt v. Flink, 658 P.2d 1065 (Mont. 1983); West Virginia, W.Va. Code § 33-11-4(a) (1988), Jenkins v. J.C. Penney Cas. Ins. Co., 280 S.E.2d 252 (W.Va. 1981); New Hampshire, N.H. Rev.Stat.Ann. §417:19(I) (1990), Shaheen v. Preferred Mut. Ins. Co., 668 F.Supp. 716 (D.N.H. 1987); New Mexico, N.M.Stat.Ann. § 59A-16-30 (1989).

[12]    Deceptive Trade Practices Act:  Texas, Tex. Bus. & Com. Code § 17.46 (1987); Arkansas, Ark.Stat.Ann. 23-66-206 (1987).

[13]    Consumer Protection Statute:  Washington, Levy v. North Am. Co. for Life and Health Ins., 586 P.2d 845 (Wash. 1978); Massachusetts, Dodd v. Commercial Union Ins. Co., 365 N.E.2d 502 (Mass. 1977); Oklahoma, Christian v. American Home Assurance Co., 577 P.2d 899 (Okla. 1977).

[14]    Statutes:  Georgia, O.C.G.A. § 33-4-6 (1982); Louisiana, La.Rev.Stat. Ann. § 22:658 (Supp. 1990); Tennessee, Tenn. Code Ann. § 56-7-105 (Supp. 1988); Wisconsin, Wis.Stat. § 628.46 (1989).

[15]    New Hampshire, Lawton v. Great Southwest Fire Ins. Co., 392 A.2d 576 (N.H. 1978); Utah, Beck v. Farmers Ins. Exchange, 701 P.2d 794 (Utah 1985); Wyoming, Arnold v. Mountain W. Farm Bureau Mut. Ins. Co., 707 P.2d 161 (Wyo. 1985); Virginia, A & E Supply Co. v. Nationwide Mut. Fire Ins. Co., 798 F.2d 669 (4th Cir. 1986).

and

> This section may not be construed to impair the
> right of any person to seek redress in law or equity
> for any conduct which is otherwise actionable.  Id.
> at §230A(f)(3).

This language makes it abundantly clear that the Maryland legislature in no way prohibits, or even discourages, the cause of action set forth in Count III of Plaintiffs' Complaint. To the contrary, these sections can be interpreted as a signal to the Courts that the legislature intended to allow private remedies such as Plaintiffs' cause of action for breach of duty of good faith and fair dealing in addition to the administrative remedies set forth in §230A.

In Jacques v. First National Bank, 307 Md. 527, 515 A.2d 756 (1986), the Maryland Court of Appeals expressly recognized a tort duty of care arising from contractual dealings between a bank and a loan applicant.  The Court in Jacques, after recognizing that not every contractual duty carries with it a concomitant tort duty,[16] stated the following:

> In determining whether a tort duty should be
> recognized in a particular context, two major
> considerations are:  the nature of the harm likely to
> result from a failure to exercise due care, and the
> relationship that exists between the parties.
> Jacques, 515 A.2d at 759.

When passing on the first consideration, the Court stated that "[a]n additional factor relevant to the determination of whether to recognize the existence of a tort duty is the nature of the business of the party upon whom the burden is sought to be imposed."  Id. at 763.  The Court ruled that the banking business is "affected with the public interest."  In so holding, the Court cited with approval an Iowa Supreme Court decision which held that the insurance business also is affected

---

[16]    See, Heckrotte v. Riddle, 224 Md. 591, 16A A.2d 879 (1961).

20

with a public interest.  Id., citing Duffie v. Banker's Life Association of Des Moines, 160 Iowa 19, 139 N.W. 1087 (1913).  The Court in Jacques ultimately concluded that due to the special relationship between the parties, and in light of the harm likely to occur as a result of the bank's failure to process loan applications with reasonable care, the bank owed a tort duty to its loan applicants.

Plaintiffs vigorously assert that the underlying rationale relied upon by the Jacques court, Maryland's highest court, has clear application to the circumstances of this case.  The insurance business, having all of the trappings of the banking business, is "affected with a public interest."  Like the banking industry, the insurance industry is subject to licensing and regulation by the state, its activities are tightly regulated and it operates only to the extent permitted by the state.  The reason for such strict regulation stems from the potential harm to consumers.   In an effort to protect the public, the Maryland legislature enacted §230A (Unfair Claim Settlement Practices), Article 48A, Annotated Code of Maryland.  In so doing, the legislature has implicitly recognized that the insurance business is affected with a public interest warranting the enactment of special legislation to protect consumers.

The relationship between an insurer and its insured, like that of a bank and its loan applicant, is such that a tort duty should be recognized.  Like the Jacques, Plaintiffs here are "particularly vulnerable and dependent" upon the Defendants' exercise of due care in investigating and honoring Plaintiffs' claim.  In effect, the Defendants can void an insurance contracts with the Plaintiff without justification, and while so doing, rely upon the fact that when all is said and done, regardless of how their insured has been harmed, their liability will be capped at property losses within the policy limits.

Plaintiffs submit to this Court that the same justification exists for permitting a tort duty between an insurer and its insured, under the circumstances attendant to this case, as between a bank and its loan applicant. The relationship between them is no less "special" and deserving of protection. The control over the decision making process is equally within the hands of the bank or insurer. Public policy demands that an insurer be subject to liability in tort, as well as contract, as a means of preventing injustice from occurring and redressing those injured thereby. The potential injustice, which invokes public policy considerations, is ultimately those activities, such as failing to settle a claim within policy limits, which expose the insured to financial loss.

Public policy demands that insurers who, without justification, engage in a course of conduct, as is occurring here, be subject to tort liability. To hold otherwise, would have the practical impact of allowing insurers to withhold payment under the insurance contract, without justification, and to do so without fear of reprisal, secure in the knowledge that they will not be responsible for any liability they incur. Plaintiffs maintain that this is the same public policy interest which belies third-party bad faith claims. Insurers should not be permitted to abrogate their duties to their insureds with impunity.

## III.   COVERAGE EXISTS UNDER THE POLICY FOR THE OCTOBER 2000 FIRE LOSS AT THE POE PROPERTY.

### A.  <u>Since the October 2000 Reporting Form and Premium Payment Were Timely Made for the Poe Property, the Policy Covers the October 22, 2000 Fire Loss</u>

Summary Judgment should be granted in Plaintiff's favor based upon three simple, and undisputed facts: 1) the Insured timely submitted its Monthly Reporting Form for October 2000 ; 2) the October 2000 Monthly Reporting Form listed the property damaged in the

fire and for which this Claim is made; and, 3) the property previously had been reported to the

Insurer (it was not a "new start").  See Exhibits 7 and 10.  If the loss had occurred in April 2000,

for example, or had occurred on a property not previously reported or covered under the Policy,

Defendants argument would have greater merit.  Under the terms of the Policy (even if the 10-96

edition of the HBIS-4 form was included) as applied to the facts of this case, Defendants'

argument fails, and summary judgment should be granted in favor of Plaintiff.

　　　　　Maryland law clearly defines the steps by which a contract of insurance must be

analyzed.  In Bailer v. Erie Ins., 344 Md. 515, 687 A.2d 1375 (1997), Judge Rodowsky recently

set forth for the Court the bases for construction of insurance policies:

> "Under Maryland law, '[i]nsurance policies, being contractual, are construed as
> other contracts.'  Bond v. Pennsylvania Nat'l Mut. Casualty Ins. Co., 289 Md. 379,
> 384, 424 A.2d 765, 768 (1981).   As such, a court interpreting an insurance policy
> is to examine the instrument as a whole, focusing on the character, purpose, and
> circumstances surrounding the execution of the contract.  Pacific Indem. Co. v.
> Interstate Fire & Casualty Co., 302  Md. 383, 388, 488 A.2d 486, 488 (1985).
> '[W]e accord words their ordinary and accepted meanings.   The test is what
> meaning a reasonably prudent layperson would attach to the term.'  Id. Unlike the
> law of some states which construes insurance contracts against the insurer, this
> Court holds that an insurance contract will be construed against the insurer only
> when an ambiguity remains after considering the intentions of the parties from the
> policy as a whole and, if necessary, after admitting and considering any relevant
> parol evidence.  Cheney v. Bell Nat'l Life Ins. Co., 315 Md. 761, 766-67, 556
> A.2d 1135, 1138 (1989)."

Bailer, 344 Md. at 521-22, 687 A.2d at 1378.   See also Collier v. MD-Individual Practice, 327

Md. 1, 5-6, 607 A.2d 537, 539 (1992) (If the language is ambiguous, extrinsic evidence may be

consulted.");  Pacific Indem. v. Interstate Fire & Cas., 302 Md. 383, 388-89, 488 A.2d 486,

488-89 (1985);  Truck Ins. Exch. v. Marks Rentals, 288 Md. 428, 435, 418 A.2d 1187, 1190

(1980).

When the underlying facts are undisputed, but produce more than one permissible inference, the choice between those inferences should not be made by the court as a matter of law, but should be submitted to the trier of fact.   Fenwick Motor Company v. Fenwick, 258 Md. 134, 138, 265 A.2d 256 (1970).   The Court of Appeals has observed that the jury's function in the interpretation of documents then will arise wherever, in view of the surrounding circumstances and usages offered in evidence, the meaning of the writing is not so clear as to preclude doubt by a reasonable man of its meaning.   If the meaning after taking the parol evidence, if any, into account is so clear that no reasonable man could reach more than one conclusion as to the meaning of the writing under the circumstances, the court will properly decide the question of fact for itself as it may any question of fact which is equally clear. Montauk Corp. v. Seeds, 215 Md. 491, 497, 138 A.2d 907 (1958) (quoting S. Williston, 4 A Treatise on the Law of Contracts § 616 at 660-63 (3d ed.1957)).

The Policy was a continuous policy with a reporting form for the determination of the policy premium.  According to the declarations page, the form designated HBIS-4 was not marked with an "X" to identify that form as applicable to the policy purchased by the Insured. This declaration page, without the inclusion of HBIS-4 as an applicable coverage part, was the only part of the Policy which was provided to the Insured prior to the fire loss.  Exhibit 5: Deposition of Beverly Skalski at 77-78.  Ordinarily, the absence of an "x" in the form list means that the form is not included within the Policy.  Exhibit 6: Deposition of Chris Seebach at 28-29. If the HBIS-4 form applied, the liberalization clause of the Policy would preclude any restriction in coverage from the 1996 edition to the 2000 edition of the HBIS-4 form.  Accordingly, the 1996 edition is controlling as to the issues affecting coverage in this case, stating:

24

      b.      "If, at the time of **loss**, <u>you have not reported a Covered Property as</u> <u>required in this provision</u>, we do not cover that Covered Property for that **loss.** (Emphasis supplied).

Exhibit 8.  For existing inventory, the provision required only reporting, by the last day of the month, all inventory for the previous month.  Defendants later, after inception of the Insured's Policy, revised the HBIS-4 endorsement.[17]

      A review of the Policy provided reveals that the Reporting Form, on its face, supports coverage in this case.  The Reporting Form, which is a part of the Policy and is provided to the insured every month, provides:

> "Any structures **started but not reported** within the time stated in the policy are not covered.  All structures in inventory for the month ending _____ must be reported and payment received in the lockbox by _____ in order for coverage to be in effect."

Thus, by its plain language, no coverage would be provided for <u>new</u> structures which were not timely reported.  Existing structures clearly were treated differently.  So long as inventoried structures for a particular month were reported and paid for that month, coverage would be in effect.  The body of the Policy, under Section E, "Additional Conditions," does not provide more restrictive requirements, as it deals with the reporting of new starts (and the annualized renewal of those starts) so that the coverage preclusion, in the event of a late report, applies only to starts which were not reported at the time of loss.[18]  Thus, the Policy provides that the properties are

---

[17]  Although the liberalization clause of the Policy does not permit restriction of coverage during the term of the Policy, the newer edition of the HBIS-4 form is illustrative of the position taken by Defendants in this case, which was <u>not</u> supported by the language of the earlier version.

[18]  Even then, coverage exists from the moment the report is received, regardless of the late reporting.  Thus, losses are covered unless the loss occurs on a new start <u>and</u> the new property location has not yet been reported <u>and</u> the first monthly report reflecting that property is submitted late.

covered in any given month so long as that month's Reporting Form and payment have been received (See Reporting Form).  In either event, the loss at issue here is covered under the Policy.

It cannot be disputed that the Insured satisfied the Policy requirements in this case. The Insured timely submitted its Monthly Reporting Form for October 2000.  Exhibit 7: October 2000 Reporting Form.  The October 2000 Monthly Reporting Form listed the property damaged in the fire and for which this Claim is made.  Id.  The property previously had been reported to Zurich (it was not a new start).  Id.: March 2000 Reporting Form.

To interpret the Policy as Defendants suggest would allow an insurer to wait until a loss occurs to decide if it intends to pay, holding its "policy rights" in abeyance, and collecting premiums all the while.  That is outrageous.  Under Defendants' interpretation of the Policy, the moment a payment was received late, or missed, coverage is lost forever (at the sole and silent option of Zurich), even if reporting later was made and the premiums paid.  This interpretation means that Zurich could, as it did, sit silently by, collecting premiums, knowing full well that if a claim ever occurred on any of the insured properties, it would be denied.  Zurich appears to have left its Insured with the illusion of coverage, taking its money, with no intention of ever paying any claims.  Summary Judgment should be granted in favor of Plaintiff.

If summary judgment is not granted in Plaintiff's favor, at a minimum, this Court should find that the Policy is ambiguous.  Language used may be ambiguous if it is "general" and may suggest two meanings to a reasonably prudent layperson.   If the language of the contract is ambiguous, extrinsic evidence may be consulted to determine the intention of the parties and whether the ambiguous language has a trade usage. Sallie, et al., v. Tax Sale Investors, Inc., et al.149 Md. app. 141, 814 A.2d 572, 578 (2002).  "If a reasonable layperson could infer two

26

different meanings from the language used, the language is ambiguous." Nationwide Mut. Ins. Co. v. Scherr, 101 Md. App. 690, 695, 647 A.2d 1297 (1994), cert. denied, 337 Md. 214, 652 A.2d 670 (1995).  See Costello, et al. v. Nationwide Mutual Insurance Company, 143 Md. App. 403, 795 A.2d 151, 154 (2002).

Although an insurance contract is not, in the first instance, construed against the insurer, if the contract is ambiguous, the insured received the benefit of the doubt.  Indeed, as the Court noted in Nationwide Mutual Fire Insurance Company v. Tufts, et. al., 118 Md. 180, 188-89, 702 A.2d 422 (1997), in holding that the term "business purpose" was ambiguous and upholding denial of the insurer's motion for summary judgment:

> The facts create more than one possible inference.   One possible inference is that the storage of business property in the barn indicates appellees' use of the barn as part of the business and for "business purposes."   One also, however, could infer from the relatively small amount of business property in the barn that it was not being used for "business purposes."   The timing of, and the reasons for, the storage also may indicate that the barn was not considered or used by appellees as part of their business or for "business purposes."   The myriad of possible inferences is due to the ambiguity in the insurance  policy.  Drafters of insurance policies have it within their power to draft policies without ambiguity, so that exclusions and coverage options are not open to more than one inference or interpretation.  That was not done in this case.   Noting, as we did earlier, that ambiguities that create multiple inferences also create jury questions, that all inferences must be viewed in the light most favorable to the non-moving party, and that ambiguities are construed against the drafter, we perceive no error in the trial court's denial of appellant's motion for summary judgment.

Id.  Under this analysis, the finding, even if the Policy is ambiguous, the ambiguity should be resolved in Plaintiff's favor.[19]

---

[19] Construction of the contract by the parties to it before the controversy arises  is an important aid to interpretation of uncertain terms. Elbert Sallie, et al., v. Tax Sale Investors, Inc., et al.149 Md. App. 141, 814 A.2d 572, 578 (2002).  This case is replete with evidence that Defendants did not interpret the Policy, pre-loss, in the manner now asserted.  Defendants repeatedly sent notices to the Insured's agent, which stated that the consequence of late reporting

**C.  The Doctrines of Waiver and Estoppel Preclude Denial of Coverage for the Fire Loss at the Poe Property**

Waiver is "the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right." Rubinstein v. Jefferson National Life Insurance Co., 268 Md. 388, 392-93, 302 A.2d 49 (1973) (citations omitted).   An insurance company may waive provisions of its policies by express agreement, or a waiver may be inferred from the company's conduct, if the conduct is " 'inconsistent with an intention to insist upon a strict performance of the condition.' " St. Paul Fire & Marine Insurance Co. v. Molloy, 291 Md. 139, 145, 433 A.2d 1135  (1981) (quoting  Spring Garden Insurance Co. v. Whayland, 103 Md. 699, 701, 64 A. 925 (1906)).  See Allstate Insurance Company v. Reliance Insurance Company et al., 141 Md. App. 506, 786 A.2d 27 (2001) (finding waiver of occupancy clause in property policy).

Ordinarily, the question of whether an insurance company has waived a provision in a policy is a question of fact.   See St. Paul Fire & Marine Insurance Co., 291 Md. at 145, 433 A.2d 1135.   In that case, the Court of Appeals explained, "[w]hether waiver exists in a given case is normally a question for the trier of fact, for the determination of its existence vel non turns on the intent of the party ostensibly waiving the right, a state of mind which is to be derived from the facts and circumstances surrounding the purported relinquishment." Id. (citations omitted).

In order for estoppel to apply, one must have been misled and sustained injury as a result of reliance on the acts or statements of the insurer of its authorized agent. See Rubinstein,

_____

Defendants have never treated its policy as one for which late payments or reporting of existing inventory would preclude coverage, including to the present date

28

268 Md. at 393, 302 A.2d 49.   Waiver and estoppel are frequently interrelated.   In McFarland,

the Court stated:

> [W]here an insurance company adopts a course of conduct which induces an
> honest belief, reasonably founded in the mind of the insured, that strict
> compliance with policy provisions will not be required and that payment may be
> delayed without incurring a forfeiture, and the insured is misled, the company will
> be deemed to have waived the right to claim an automatic forfeiture and will be
> estopped to elect to discontinue the insurance.

McFarland, 201 Md. at 248, 93 A.2d 551 (citations omitted).   The rule in Maryland is that waiver

or estoppel may occur only when it does not create new coverage.   United Capitol Insurance Co.

v. Kapiloff, 155 F.3d 488, 497 (4th Cir.1998).

        Waiver is ordinarily a fact question because it involves intent.   Similarly, the

question of estoppel is frequently a fact question because it involves the assessment of conduct

by one party and reliance by another party.   Allstate Insurance Company v. Reliance Insurance

Company et al., 141 Md. App. 506, 786 A.2d 27, 33 (2001).   Under appropriate circumstances,

however, they may be ruled upon as questions of law.   In Maryland Fire Insurance Co. v.

Gusdorf, 43 Md. 506 (1876), an insurance policy insured goods that were to be kept in a

specified location.   The goods were moved and, subsequently, were damaged.   The lower court

presented the case to a jury with an instruction that if the jury found the insurance company

knew the goods had been moved, the company would be estopped from relying on the policy

provision.   On appeal, the Court discussed the parol evidence rule and estoppel and held that

estoppel applied.   The net effect of the ruling was to apply estoppel as a matter of law.

Similarly, in Commonwealth Casualty Co. v. Arrigo, 160 Md. 595, 154 A. 136 (1931), a case

involving a provision in a policy relating to ownership of a motor vehicle, the Court appears to

have applied waiver as a matter of law based on the insurance company's knowledge of facts.

See also (where insurer's agent, inadvertently or intentionally, put incorrect information on the

application for coverage, waiver and estoppel applied as a matter of law).

Defendants repeatedly communicated that the policy coverage "could" or "may"

be in jeopardy, including prior to the loss.  Defendants' publications represented a coverage

position contrary to that taken by defendants in this case.  See infra at 8-11.  Moreover, since the

Policy provisions at issue are conditions, which do not extend coverage, the waiver and estoppel

doctrines are applicable.

Since the Claim, Zurich has continued to accept premium payments and conduct

its insurance business as if the Insured was and continues to be covered under the Policy.  Yet,

under Zurich's interpretation of the Policy as it applies to this Claim, Zurich could similarly

choose not to pay a claim which occurred tomorrow, on the grounds that late payments and

reporting had occurred in the past.  A more realistic interpretation of Zurich's post Claim conduct

is that it recognizes, at best,  that coverage ends only as to Claims that occur during the "gap," or

the month for which reporting was not made, or was late.

**D.  Defendants' Denial of Coverage for Nonpayment of Premium is Tantamount to Cancellation of the Policy Without Statutory Notice.**

Defendants essentially "canceled" the Policy for nonpayment of premium, without

any notice to the Insured or its agent and in derogation of Maryland law.  An insurance contract,

like any other contract, is measured by its terms unless a statute, a regulation, or public policy is

violated thereby.  <u>Elbert Sallie, et al., v. Tax Sale Investors, Inc., et al.</u>149 Md. app. 141, 814

A.2d 572, 577 (2002).  Md. Insurance Code Ann. §27-601 provides:

> § 27-601. Cancellation or nonrenewal of policies--required notices. . . .
>        (d) At least 10 days before the date an insurer proposes to cancel a policy
> for nonpayment of premium, the insurer shall cause to be sent to the insured, by
> certificate of mailing, a written notice of intention to cancel for nonpayment of
> premium.

No such notice was provided by Defendants to Plaintiff.  Since notice was not provided, the

"cancellation" or "nonrenewal" of the Policy is not effective and coverage applies.[20]  Defendants

should not be permitted by sleight of hand to achieve, by confusing and ambiguous language, that

which they clearly are otherwise prohibited.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that this

Court enter an order denying Defendants' Motion for Summary Judgment, granting Plaintiff's

Cross Motion for Summary Judgment and declaring that Defendant Assurance Company of

America is under a duty to indemnify and reimburse the Plaintiff with regard to its damages and

losses as a result of the October 22, 2000 fire.

Respectfully submitted,

_____/s/_____
Vicki L. Dexter
Federal Bar No.: 03171
Irwin Green & Dexter, L.L.P.
301 W. Pennsylvania Avenue

---

[20]  Maryland law recognizes that a continuing insurance policy such as that contended by
defendants here, is a renewal policy for notice purposes.  <u>Benner v. Nationwide Mutual Insurance
Company</u>, 93 F.3d 1228,1236 (4th Cir. 1996).

Towson, Maryland 21204
Telephone No.:  (410) 832-0111
Attorneys for Plaintiff

D10280b